IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HEMAD JANFESHAN,<br><br>*Plaintiff*,<br><br>v.<br><br>U.S. CUSTOMS AND BORDER PROTECTION;<br>R. GIL KERLIKOWSKE, COMMISSIONER, U.S.<br>CUSTOMS & BORDER PROTECTION; U.S.<br>DEPARTMENT OF HOMELAND SECURITY;<br>JEH JOHNSON, SECRETARY, U.S.<br>DEPARTMENT OF HOMELAND SECURITY;<br><br>*Defendants*. | COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF |

1. This is a constitutional challenge to U.S. Customs and Border Protection's (CBP) seizure of Plaintiff Hemad Janfeshan's cellular telephone after he exercised his right to refuse to provide its passcode, and informed the agents that the phone contained attorney-client privileged information.

2. Mr. Janfeshan's phone, a Samsung Galaxy S4 smartphone, holds a vast amount of sensitive information, including attorney-client privileged communications.

3. CBP's planned search of Mr. Janfeshan's phone violates his rights to keep the private details of his life as well as his communications with counsel free from unwarranted government scrutiny.

4. Mr. Janfeshan seeks declaratory relief, an injunction against the search of his phone absent probable cause, judicial oversight in any review of attorney-client privileged information stored on the phone, and the return of his phone.

**PARTIES**

5. Plaintiff, HEMAD JANFESHAN, is a resident of Brooklyn, NY.  He is a thirty-three year old citizen of Afghanistan who has been a lawful permanent resident of the United States

   since 1995.  Defendant CBP seized Mr. Janfeshan's phone at John Fitzgerald Kennedy Airport in Queens, NY.

6.  Defendant U.S. CUSTOMS AND BORDER PROTECTION is involved in the acts challenged and employs the officers named as Defendants in this Complaint. Defendant U.S. Customs and Border Protection is a component agency within Defendant Department of Homeland Security.

7.  Defendant R. GIL KERLIKOWSKE is Commissioner of CBP.  Commissioner KERLKIKOWSKE has authority over all CBP policies, procedures, and practices relating to border searches, including those challenged in this lawsuit.  Defendant KERLIKOWSKE is sued in his official capacity.

8.  Defendant U.S. DEPARTMENT OF HOMELAND SECURITY is an agency of the United States government involved in the acts challenged, and employs the officers named as Defendants in this complaint.

9.  Defendant JEH JOHNSON is the Secretary of the Department of Homeland Security.  As head of DHS, Secretary Johnson has authority over all DHS policies, procedures, and practices related to border searches, including those challenged in this lawsuit.  Defendant JOHNSON is sued in his official capacity.

## JURISDICTION AND VENUE

10.  This case arises under the Constitution of the United States and presents a federal question within this Court's jurisdiction under 28 U.S.C. § 1331.

11.  The Court has authority to issue declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 8 U.S.C. §§ 2201-2202, Rules 57 and 65 of the Federal Rules of Civil Procedure.

12. Venue is proper in this district under 28 U.S.C. § 1391(e)(3) because Plaintiff Hemad Janfeshan resides in this district.

## FACTUAL ALLEGATIONS

13. On November 20, 2016, Mr. Janfeshan flew from Cairo to New York on an EgyptAir flight.

14. Mr. Janfeshan was able to return to the United States following a negotiated effort between the parties in *Janfeshan v. Kerry*, No. 1:16 CV 04324, (E.D.N.Y. Aug. 3, 2016).

15. Mr. Janfeshan landed at JFK around 3:15 P.M.

16. Two CBP agents met Mr. Janfeshan at the gate when he landed and then escorted him to a room where other travelers were waiting while undergoing secondary inspection screening.

17. The CBP agents were in civilian clothes with CBP badges on lanyards around their necks. One of the CBP agents was tall, of average build, and had a dark complexion. ("John Doe 1"). The other agent had very short hair, a stocky build, and appeared to be of South Asian descent ("John Doe 2").

18. John Doe 1 and John Doe 2 took Mr. Janfeshan from the main room with other travelers to a small room and conducted a full body search. The agents searched his pockets and took Mr. Janfeshan's phone – a Samsung Galaxy S4 – and wallet. Mr. Janfeshan's phone was powered off.

19. After that, the agents instructed Mr. Janfeshan to retrieve his luggage from the carousel. Agents John Doe 1 and John Doe 2 conducted a physical search of Mr. Janfeshan's luggage in his presence.

20. A short while later, John Doe 1 took Mr. Janfeshan into another small room. Mr. Janfeshan observed that there was a camera in the room.

21. John Doe 1 asked Mr. Janfeshan questions about his travel to Egypt.

22. John Doe 1 then proceeded to question Mr. Janfeshan for over an hour about prior travel.

23. During this questioning, John Doe 1 received multiple calls and messages that seemed to direct his questions of Mr. Janfeshan.

24. While John Doe 1 questioned Mr. Janfeshan, John Doe 2 would come in and out of the room with the phone. Towards the middle of this interrogation, John Doe 1 started asking Mr. Janfeshan for a passcode to his phone, which was locked. Exercising his right, Mr. Janfeshan said that he would not provide the passcode.

25. Mr. Janfeshan apologized to John Doe 1, and explained that he had conversations with his lawyer on the phone that he didn't want the agent to see.

26. John Doe 1 asked Mr. Janfeshan at one point: "Why are you so paranoid?"

27. The questioning lasted between an hour and an hour and a half. Towards the end, John Doe 2 entered the room and said: "We're good. I'm going to call your lawyer, I'm going to tell her that you can go home."

28. John Doe 2 then asked Mr. Janfeshan: "Can you give us the password?" Mr. Janfeshan reasserted his rights, and told him: "I'm not going to give you the password, I cannot give it to you. I told you there are attorney and client conversations in the phone, and I don't want you to look at those." He also told them that he had private conversations with family members on the phone that he did not want them to see.

29. At that point, Mr. Janfeshan's phone was in the room. John Doe 1 asked Mr. Janfeshan to provide phone numbers for four individuals – his former landlord in Brooklyn, his

former landlord in Egypt, his wife, and his mother-in-law. Mr. Janfeshan told him that he would need to look in his phone for those numbers.

30. John Doe 1 told Mr. Janfeshan that he could unlock the phone himself and then show him the phone numbers, without providing the passcode. Because he did not want to prolong an already lengthy interrogation coming on the heels of a long flight and an even longer ordeal where Mr. Janfeshan was kept abroad by the U.S. government for over a year against his will, Mr. Janfeshan unlocked the phone four times, and put the phone on the table for John Doe 1 to see those phone numbers. Mr. Janfeshan did not give John Doe 1 the passcode to his phone.

31. John Doe 1 told Mr. Janfeshan: "You know we can detain your phone."

32. John Doe 1 then asked again: "So you don't want to unlock it for us?"

33. Mr. Janfeshan responded that he had to think about his own rights and again explained that he could not provide the passcode.

34. When John Doe 1 made it clear that he would seize Mr. Janfeshan's phone, Mr. Janfeshan told him that he needed his phone as he did not know where he would be staying that evening.

35. John Doe 1 told Mr. Janfeshan: "You know you can have your phone." Mr. Janfeshan understood John Doe 1 to imply that he would be able to take his phone if he provided the passcode.

36. John Doe 1 told Mr. Janfeshan: "If you give us the password, it will not take us that long, and you can have your phone and leave." Mr. Janfeshan understood John Doe 1 to imply that he intended to make a digital copy of the phone with Mr. Janfeshan's consent, and

that an examination of the seized content would likely take place after Mr. Janfeshan had left the airport.

37. John Doe 1 told Mr. Janfeshan that CBP would keep the phone for one or two weeks.

38. Mr. Janfeshan asked for a receipt for the phone.

39. John Doe 2 gave Mr. Janfeshan a "Detention Notice and Custody Receipt for Detained Property" (Phone Receipt).

40. On the Phone Receipt, one of the agents wrote "Lab Analysis" in the "Reason for Detention" box.

41. The Phone Receipt did not specify which tests or inquiries were to be conducted on Mr. Janfeshan's phone.

42. Mr. Janfeshan was returning home to the United States after a forced absence of eighteen months, imposed on him against his will by U.S. government agencies. Without a work permit, he had been unable to work in Egypt while there and is still in debt.

43. The detention of his phone created an additional financial burden for Mr. Janfeshan because he had to spend a significant portion of his meager resources to buy a new phone, as he had little idea about when CBP would return his phone. Mr. Janfeshan spent $80, one fifth of the $400 he had, to buy a new phone.

44. Moreover, Mr. Janfeshan was left without the phone numbers for most of his friends and relatives in New York City and the surrounding area, he had only written down his wife's number, his mother-in-law's number, and his counsel's number. At a time when Mr. Janfeshan had the greatest need to be able to reach out to a network of friends, acquaintances, and relatives, he was suddenly rudderless. He spent days trying to find stable employment and housing.

45. After he was admitted to the United States as a lawful permanent resident, Mr. Janfeshan informed counsel that CBP had seized his phone, explaining that he believed the agents had done so because he exercised his right not to provide the passcode. Mr. Janfeshan informed counsel that he had told the agents that the phone contained attorney-client privileged information.

46. On November 25, 2016, five days after his arrival, Kimberly Kelly, Senior Attorney in the Office of the Associate Chief Counsel for CBP – New York, sent undersigned counsel notice via e-mail that CBP intended to conduct a search of Mr. Janfeshan's phone. Ms. Kelly wrote: "Given the unusual case that you represent this incoming passenger in an action regarding an aspect of this entry to the United States, U.S. Customs and Border Protection (CBP) is addressing this correspondence to you as a courtesy."

47. Ms. Kelly informed undersigned counsel that CBP would be conducting a "border search" of Mr. Janfeshan's phone.

48. Ms. Kelly wrote: "I invite your client to provide the passcode to the detained cellphone. CBP will proceed with the search regardless of whether your client provides the passcode."

49. Ms. Kelly also explained that CBP had "identified a Filter Team" to address the attorney-client privilege issue Mr. Janfeshan had raised.

50. Ms. Kelly asked, as an alternative to providing the passcode, for Mr. Janfeshan to come to the airport to type in the passcode, without disclosing the passcode to CBP. However, Ms. Kelly also wrote: "Counsel will not be permitted to be present during this event as it is a continuation of a border search."

51. Ms. Kelly then notified undersigned counsel that without the passcode "[W]e understand that there is an increased, but highly unlikely, chance that his phone will be rendered permanently inoperable by the CBP search."

52. Ms. Kelly asked undersigned counsel to provide the names of any individuals who would fall under the umbrella of the attorney-client privilege.

53. On November 29, 2016, undersigned counsel responded to Ms. Kelly, informing her that Mr. Janfeshan did not consent to the search of his phone, would not provide the passcode to his phone, and objected to CBP's unilateral appointment of a "filter team" to determine what information on the phone would fall under the attorney-client privilege.[1]

54. Counsel for Mr. Janfeshan provided Ms. Kelly with a list of names that would fall under the umbrella of the attorney-client privilege for the scope of this search.

55. Counsel for Mr. Janfeshan objected to CBP's unilateral appointment of a "filter team" to search his phone – which had been seized while Mr. Janfeshan was an adverse party in litigation with Defendant DHS on a related matter.

56. On December 5, 2016, Ms. Kelly informed counsel that "CBP will be proceeding with its lawful border search."

57. Shortly thereafter, counsel for Mr. Janfeshan notified Ms. Kelly that he would seek a temporary restraining order and asked that CBP refrain from searching his phone until the Court had a chance to weigh in on the question of whether CBP could search and review Mr. Janfeshan's privileged communications.

---

[1] Counsel also copied counsel of record for Defendants, Assistant United States Attorney Scott Dunn, in *Janfeshan v. Kerry* No. 1:16 CV 04324, (E.D.N.Y. Aug. 3, 2016).

58. On December 5, 2016, Mr. Janfeshan's counsel filed a motion for a temporary restraining order to enjoin Defendants DHS and CBP from conducting a search of his phone.[2]

59. On December 6, 2016, the Court held a telephone conference to discuss the motion for a temporary restraining order.

60. During the telephone conference, Assistant United States Attorney Elliot Schachner informed the Court that CBP had not initiated the search and would not commence a search of Mr. Janfeshan's phone until the court resolved the motion for a temporary restraining order. Mr. Schachner indicated that Defendant intended to conduct a "border search" of Mr. Janfeshan's phone.

61. On December 6, 2016, the Court ordered Mr. Janfeshan to file a new, related action concerning CBP's stated intent to conduct a border search of his phone.

62. On December 9, 2016, Assistant United States Attorney Scott Dunn informed the Court that CBP would refrain from a search of the phone until a new action was filed.[3]

63. At no point up until the date of this filing has Ms. Kelly, Mr. Dunn, or Mr. Schachner stated to Mr. Janfeshan's counsel or to the Court that CBP has a warrant or probable cause to seize or search Mr. Janfeshan's phone.

64. At no point up until the date of this filing has Ms. Kelly, Mr. Dunn, or Mr. Schachner stated to Mr. Janfeshan's counsel or to the Court that CBP has even reasonable suspicion to seize or search Mr. Janfeshan's phone.

65. Mr. Janfeshan considers the contents of his phone to be private. Mr. Janfeshan ensures that his phone remains protected by locking his phone with a passcode.

---

[2] Plaintiff filed the TRO in *Janfeshan v. Kerry*, 1:16-cv-04324, ECF No. 10.
[3] Mr. Dunn informed the Court during a status conference held in *Janfeshan v. Kerry*.

66. Data stored on Mr. Janfeshan's phone, including but not limited to emails, text messages, documents, pictures, and attachments is protected by the attorney client privilege.

67. Mr. Janfeshan's phone also contains information that is highly personal, and reveals intimate details about his life, including his thoughts, his associations, and his expressive choices.

68. Mr. Janfeshan is likely to be subjected to similar searches in the future under CBP's unconstrained search policies because the CBP agent who sought consent to seize the contents of his phone and then seized the phone when consent was withheld chose to act based on factors that will not change – Mr. Janfeshan's national origin and religion, his past travels, and his decision to exercise his right to refuse to consent to a search by providing the passcode to his phone.

69. Prior to this most recent trip, law enforcement agents have repeatedly questioned Mr. Janfeshan about his travel to Yemen, both on his way out of the United States and upon entry and admission to the United States. Mr. Janfeshan traveled to Yemen three times, the first time alone, and the other times with his family. Mr. Janfeshan and his family traveled to Yemen in pursuit of an affordable place to provide Arabic and religious schooling for his four children.

70. Mr. Janfeshan had attempted to provide for his wife and children here in the United States but found it difficult to do so on his salary as a cab driver. He was better able to support them while they were in Yemen. They were able to pursue religious and Arabic schooling while maintaining a modicum of financial stability.

71. On November 20, 2016, CBP agents again questioned Mr. Janfeshan about his travel to Yemen – events which took place nearly three years ago now. On his penultimate trip

returning to the United States, law enforcement agents questioned Mr. Janfeshan about his travel to Yemen and made a digital copy of his phone. The fact of his past travels cannot change, and it is likely that agents will continue to seek to question him about these trips well into the future.

72. Further, it was entirely unfeasible for Mr. Janfeshan to fly to the United States without a phone – the negotiated plan to secure his return depended on his ability to reach counsel by phone while at the airport in Cairo.

## CLAIMS

## COUNT 1

## VIOLATION OF FOURTH AMENDMENT

73. Plaintiff Hemad Janfeshan incorporates by reference each and every allegation contained in the paragraphs above.

74. By seizing, searching, and copying Mr. Janfeshan's phone and its contents, Defendants violate his rights under the Fourth Amendment to the United States Constitution.

## COUNT 2

## BREACH OF ATTORNEY-CLIENT PRIVILEGE

75. Plaintiff Hemad Janfeshan incorporates by reference each and every allegation contained in the paragraphs above.

76. By seizing, searching, and copying Mr. Janfeshan's phone and its contents, Defendants breach the attorney-client privilege protecting information stored on his phone.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully asks this Court to:

77. Declare that defendants have violated Mr. Janfeshan's rights under the Fourth Amendment to the United States Constitution and his rights to the protections afforded by the attorney-client privilege; and

78. Enjoin Defendants from searching, copying, and seizing Mr. Janfeshan's phone or a digital copy of Mr. Janfeshan's phone without probable cause; and

79. Enjoin Defendants from reviewing attorney-client privileged information on Mr. Janfeshan's phone or a digital copy of Mr. Janfeshan's phone without judicial oversight; and

80. Awarding Mr. Janfeshan's counsel reasonable attorneys' fees and litigations, including but not limited to fees, costs, and disbursements pursuant to 28 U.S.C. § 2412; and

81. Granting such other and further relief as the Court deems just and proper.

Date: December 14, 2016

By: /s/_____
Naz Ahmad
Tarek Z. Ismail
Ramzi Kassem
**CLEAR project**
**Main Street Legal Services, Inc.**
CUNY School of Law
2 Court Square
Long Island City, NY 11101
T: (718) 340-4630
F: (718) 340-4478
E: naz.ahmad@law.cuny.edu