## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HEMAD JANFESHAN,<br><br>*Plaintiff*,<br><br>v.<br><br>U.S. CUSTOMS AND BORDER PROTECTION; KEVIN K. McALEENAN, ACTING COMMISSIONER, U.S. CUSTOMS & BORDER PROTECTION; U.S. DEPARTMENT OF HOMELAND SECURITY; JOHN F. KELLY, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>*Defendants*. | **FIRST AMENDED COMPLAINT**<br><br>Case No. 16-CV-6915 (ARR) (LB) |

1. This lawsuit challenges U.S. Customs and Border Protection's (CBP) search of Plaintiff Hemad Janfeshan's smartphone and seizure of the data on the device after he exercised his right to refuse to provide its passcode to protect his private information from government intrusion, and informed the agents that the smartphone also contained attorney-client privileged information.

2. Mr. Janfeshan's smartphone, a Samsung Galaxy S4 smartphone, holds a vast amount of personal, expressive, and sensitive information, including but not limited to attorney-client privileged communications.

3. CBP's forensic search of Mr. Janfeshan's smartphone without reasonable suspicion or a warrant violates his rights to keep the private details of his personal life as well as his communications with counsel free from unwarranted government scrutiny.

4. Mr. Janfeshan seeks a declaratory judgment that the search and seizure of his smartphone violated the Fourth Amendment to the U.S. Constitution, impermissibly breached attorney-client privilege, and constituted unlawful agency action under the

Administrative Procedure Act, as well as an injunction ordering Defendants to return or destroy any seized data in their custody or control and to inform Plaintiff whether that data has been disclosed to other agencies or individuals.

## PARTIES

5. Plaintiff, HEMAD JANFESHAN, is a resident of Brooklyn, New York. He is a thirty-three year old citizen of Afghanistan who has been a lawful permanent resident of the United States since 1995. Defendant CBP seized Mr. Janfeshan's smartphone at John Fitzgerald Kennedy Airport in Queens, NY.

6. Defendant U.S. CUSTOMS AND BORDER PROTECTION is involved in the acts challenged and employs Kevin K. McALEELAN, named as Defendant in this Complaint. Defendant U.S. Customs and Border Protection is a component agency within Defendant U.S. Department of Homeland Security.

7. Defendant KEVIN K. McALEENAN is Acting Commissioner of CBP. Acting Commissioner McALEENAN has authority over all CBP policies, procedures, and practices relating to border searches, including those challenged in this lawsuit. Defendant McALEENAN is sued in his official capacity.

8. Defendant U.S. DEPARTMENT OF HOMELAND SECURITY (DHS) is an agency of the U.S. government involved in the acts challenged, and employs JOHN F. KELLY, named as Defendant in this Complaint.

9. Defendant JOHN F. KELLY is the Secretary of the Department of Homeland Security. As head of DHS, Secretary KELLY has authority over all DHS policies, procedures, and practices related to border searches, including those challenged in this lawsuit. Defendant KELLY is sued in his official capacity.

## JURISDICTION AND VENUE

10. This case arises under the Constitution of the United States and presents a federal question within this Court's jurisdiction under 28 U.S.C. § 1331.

11. Jurisdiction is also conferred by the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), which provides that a reviewing court shall set aside unlawful agency action.

12. The Court has authority to issue declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 8 U.S.C. §§ 2201-2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

13. Venue is proper in this district under 28 U.S.C. § 1391(e)(3) because Plaintiff Hemad Janfeshan resides in this district.

## FACTUAL ALLEGATIONS

### Mr. Janfeshan's Return to the United States

14. On November 20, 2016, Mr. Janfeshan flew from Cairo to New York on an Egypt Air flight, returning from a sixteen month forced absence. He landed at JFK around 3:15 P.M.

15. Four months before his return, Mr. Janfeshan had commenced a separate action, *Janfeshan v. Kerry*, Case No. 16-cv-4324 (E.D.N.Y.) (*Janfeshan I*). In that case, Mr. Janfeshan sought declaratory and injunctive relief against Defendants for violations of his Fifth Amendment constitutional due process rights, and pursuant to the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(20), 1129a, and the Administrative Procedure Act, 5 U.S.C. § 706. Mr. Janfeshan alleged that Defendant agents of the U.S. government improperly denied his application for a boarding foil that would have allowed him to board a flight home with an expired green card and that they failed to provide him with a

procedurally adequate mechanism to challenge the denial of his application. Mr. Janfeshan sought, among other things, a judicial order in order to obtain appropriate documentation to board a plane home to the United States.

16. With the Court's supervision in *Janfeshan I*, the parties reached a resolution whereby, instead of a boarding foil, Defendant DHS issued a letter assuring the air carrier that individuals in Mr. Janfeshan's situation with expired, ten-year permanent resident cards may be boarded without penalty.

17. Mr. Janfeshan was finally able to return to the United States pursuant to this negotiated effort between the parties in *Janfeshan I*. The negotiated plan involved Mr. Janfeshan confirming with counsel over the phone that he was able to board the plane. Mr. Janfeshan's plane arrived at JFK on November 20, 2016 at approximately 3:15 P.M. Mr. Janfeshan's counsel came to the airport at 4:30 P.M. in order to greet Mr. Janfeshan upon his return and to ensure that there were no issues on arrival.

18. Two CBP agents met Mr. Janfeshan at the gate when he landed and then escorted him to a room where other travelers were waiting while undergoing secondary inspection screening.

19. The agents were in civilian clothes with CBP badges on lanyards around their necks. One of the CBP agents was tall, of average build, and had a dark complexion ("John Doe 1"). The other agent had very short hair, a stocky build, and appeared to be of South Asian descent ("John Doe 2").

20. John Doe 1 and John Doe 2 took Mr. Janfeshan from the main room with other travelers to a smaller room and conducted a full body search. The agents searched his pockets and took Mr. Janfeshan's smartphone – a Samsung Galaxy S4 – and wallet. Mr. Janfeshan's

smartphone was powered off and the smartphone was also password-protected in an effort to protect the private information stored on his device.

21. The agents then escorted Mr. Janfeshan to a baggage carousel where they instructed Mr. Janfeshan to retrieve his luggage. Agents John Doe 1 and John Doe 2 conducted a physical search of Mr. Janfeshan's luggage in his presence and then escorted him back to the main secondary screening room.

22. A short while later, John Doe 1 took Mr. Janfeshan into another small room. Mr. Janfeshan observed that there was a camera in the room.

23. John Doe 1 asked Mr. Janfeshan questions about the past sixteen months he had spent with his family in Egypt.

24. During this questioning, John Doe 1 received multiple calls and messages that seemed to direct his questions of Mr. Janfeshan.

25. At the same time, Mr. Janfeshan's counsel made repeated calls to CBP-JFK in Terminal 4 from approximately 4:45 P.M – 6:45 P.M. to inquire as to when Mr. Janfeshan would be released. The agent on duty would only tell counsel that Mr. Janfeshan would be released "soon."

26. While John Doe 1 questioned Mr. Janfeshan, John Doe 2 came in and out of the room with Mr. Janfeshan's smartphone. Towards the middle of this interrogation, John Doe 1 began to ask Mr. Janfeshan for a passcode to his smartphone, which was locked. Exercising his right to refuse to unlock his smartphone, Mr. Janfeshan said that he would not provide the passcode.

27. Mr. Janfeshan's smartphone, similar to the smartphone of any other individual today, contains a wealth of sensitive and expressive information, including family photographs,

personal discussions with friends and family, as well as privileged communications with attorneys.

28. Mr. Janfeshan apologized to John Doe 1, and explained that he had private information and conversations with his lawyers on the phone that he didn't want the agent to see.

29. John Doe 1 asked Mr. Janfeshan at one point: "Why are you so paranoid?"

30. In total, the questioning lasted between an hour and an hour and a half. Towards the end, John Doe 2 entered the room and said: "We're good. I'm going to call your lawyer, I'm going to tell her that you can go home."

31. John Doe 2 then asked Mr. Janfeshan: "Can you give us the password?" Mr. Janfeshan again asserted his right not to consent to the search of his smartphone, and told John Doe 2: "I'm not going to give you the password, I cannot give it to you. I told you there are attorney and client conversations in the phone, and I don't want you to look at those." He also reiterated that he had private conversations with family members on the phone that he did not want the agents to see.

32. At that point, Mr. Janfeshan's smartphone was on the table in front of him. John Doe 1 asked Mr. Janfeshan to provide phone numbers for four individuals – his former landlord in Brooklyn, his former landlord in Egypt, his wife, and his mother-in-law. Mr. Janfeshan told him that he would need to look in his smartphone for those numbers.

33. John Doe 1 told Mr. Janfeshan that he could unlock the smartphone himself and then show him the phone numbers, without providing the passcode. Because he did not want to prolong an already lengthy interrogation coming on the heels of a long flight and a much longer ordeal where Mr. Janfeshan was kept abroad by the U.S. government for over a year against his will, Mr. Janfeshan unlocked the smartphone four times, and put

the smartphone on the table for John Doe 1 to see each of those phone numbers. Mr. Janfeshan did not give John Doe 1 the passcode to his smartphone.

34. John Doe 1 told Mr. Janfeshan: "You know we can detain your phone."

35. John Doe 1 then asked again: "So you don't want to unlock it for us?"

36. Mr. Janfeshan responded that he had to think about his own rights and again explained that he could not provide the passcode.

37. When John Doe 1 made it clear that he would seize Mr. Janfeshan's smartphone, Mr. Janfeshan told him that he needed it as he did not know where he would be staying that evening.

38. John Doe 1 told Mr. Janfeshan: "If you give us the password, it will not take us that long, and you can have your phone and leave." Mr. Janfeshan understood John Doe 1 to imply that he intended to make a digital copy of the smartphone with Mr. Janfeshan's consent, and that an examination of the seized content would likely take place after Mr. Janfeshan had left the airport. Mr. Janfeshan again refused to provide the passcode.

39. John Doe 1 told Mr. Janfeshan that CBP would keep the smartphone for one or two weeks.

40. Mr. Janfeshan asked for a receipt for the smartphone.

41. John Doe 2 gave Mr. Janfeshan a "Detention Notice and Custody Receipt for Detained Property," also known as DHS Form 6051D (custody receipt).

42. On the custody receipt, one of the agents wrote "Lab Analysis" in the "Reason for Detention" box.

43. The custody receipt did not specify which tests or inquiries were to be conducted on Mr. Janfeshan's smartphone.

7

44. Mr. Janfeshan was returning home to the United States after a forced absence of eighteen months, imposed on him through the actions and omissions of U.S. government agencies. Without a work permit, he had been unable to work in Egypt while there and is still in debt as a result. *See generally*, Complaint, *Janfeshan v. Kerry*, Case No. 16-CV-4324, ECF No. 1 (E.D.N.Y. Aug. 3, 2016).

45. The detention of his smartphone created an additional financial burden for Mr. Janfeshan because he had to spend a significant portion of his meager resources to buy a new phone, as he had no specific indication when CBP would return his smartphone. Mr. Janfeshan spent $80, one fifth of the $400 he had, to buy a new phone.

46. Moreover, Mr. Janfeshan was left without the phone numbers for most of his friends and relatives in New York City and the surrounding area. He had only written down his wife's number, his mother-in-law's number, and his counsel's number. At a time when Mr. Janfeshan had the greatest need to be able to reach out to a network of friends, acquaintances, and relatives, he was suddenly rudderless. He spent days trying to find stable employment and housing.

47. After he was readmitted to the United States, Mr. Janfeshan informed counsel that CBP had seized his phone, explaining that he believed the agents had done so because he exercised his right not to provide his passcode. Mr. Janfeshan informed counsel that he had told the agents that the phone contained both personal and attorney-client privileged information.

### Defendants Search Mr. Janfeshan's Smartphone

48. On November 25, 2016, five days after Mr. Janfeshan's return to the United States, a Senior Attorney in the Office of the Associate Chief Counsel for CBP in New York, sent

undersigned counsel notice via e-mail that CBP intended to conduct a search of Mr. Janfeshan's smartphone. The CBP Senior Attorney wrote: "Given the unusual case that you represent this incoming passenger in an action regarding an aspect of this entry to the United States, U.S. Customs and Border Protection (CBP) is addressing this correspondence to you as a courtesy."

49. The CBP Senior Attorney informed undersigned counsel that CBP would be conducting a "border search" of Mr. Janfeshan's smartphone.

50. The CBP Senior Attorney wrote: "I invite your client to provide the passcode to the detained cellphone. CBP will proceed with the search regardless of whether your client provides the passcode."

51. The CBP Senior Attorney also explained that CBP had "identified a Filter Team" to address the attorney-client privilege issue Mr. Janfeshan had raised.

52. The CBP Senior Attorney asked, as an alternative to providing the passcode, for Mr. Janfeshan to come to the airport to type in the passcode without disclosing the passcode to CBP. However, the CBP Senior Attorney also wrote: "Counsel will not be permitted to be present during this event as it is a continuation of a border search."

53. The CBP Senior Attorney then notified undersigned counsel that, without the passcode, "there is an increased, but highly unlikely, chance that his phone will be rendered permanently inoperable by the CBP search."

54. The CBP Senior Attorney asked undersigned counsel to provide the names of any individuals who would fall under the umbrella of the attorney-client privilege.

55. On November 29, 2016, undersigned counsel responded to the CBP Senior Attorney informing her that Mr. Janfeshan did not consent to the search of his smartphone, which

9

had been seized while Mr. Janfeshan was an adverse party in litigation with Defendant DHS on a related matter; that Mr. Janfeshan would not provide the passcode to his smartphone; and that his counsel objected to CBP's unilateral appointment of a "filter team" to determine what information on the smartphone would fall under the attorney-client privilege.[1]

56. Counsel for Mr. Janfeshan provided the CBP Senior Attorney with the names of attorneys who had privileged communications with Mr. Janfeshan.

57. On December 5, 2016, the Senior CBP Attorney informed counsel that "CBP will be proceeding with its lawful border search."

58. Shortly thereafter, counsel for Mr. Janfeshan notified the CBP Senior Attorney that he would seek a temporary restraining order and asked that CBP refrain from searching his phone until the Court had a chance to address the question whether CBP could search and review Mr. Janfeshan's privileged communications.

59. On December 5, 2016, Mr. Janfeshan's counsel filed a motion for a temporary restraining order to enjoin Defendants DHS and CBP from conducting a search of his smartphone.[2]

60. On December 6, 2016, the Court held a telephone conference to discuss the motion for a temporary restraining order.

61. During the telephone conference, Assistant United States Attorney Elliot Schachner informed the Court that CBP had not initiated the search. Mr. Schachner stated that Defendants intended to conduct a "border search" of Mr. Janfeshan's smartphone. The Court's Order of December 6, 2016 stated that, on consent, Defendants would not search the phone until the motion was resolved.

---

[1] Counsel also copied Assistant United States Attorney Scott Dunn, counsel of record for Defendants in *Janfeshan v. Kerry*, Case No. 16-CV-4324 (E.D.N.Y.), which was then still pending.
[2] *Janfeshan v. Kerry*, 16-CV-04324, ECF No. 10.

62. On December 6, 2016, the Court ordered Mr. Janfeshan to file a new, related action concerning CBP's stated intent to conduct a border search of his smartphone.

63. On December 14, 2016, as ordered by the Court, Mr. Janfeshan filed this separate action seeking to restrict CBP from searching his smartphone without an articulated suspicion, and from accessing any privileged information on his smartphone.

64. On December 23, 2016, Defendants filed a letter-motion, styled as a "Motion to Amend/Correct/Supplement", seeking an order from the Court permitting CBP to conduct a search of Mr. Janfeshan's smartphone and directing counsel to provide additional information to Defendants. ECF No. 9. Mr. Janfeshan responded the same day, objecting to any search of the smartphone prior to the Court's adjudication of his forthcoming motion for a preliminary injunction. ECF No. 10.

65. On December 29, 2016, the Court held a telephonic status conference on the issue of the search of Mr. Janfeshan's smartphone. Mr. Schachner, counsel for Defendants, asserted that CBP intended to conduct a "full search" of Mr. Janfeshan's smartphone. Upon a request for clarification by the Court, Mr. Schachner explained that a "full search" was the same as a "forensic search" of the smartphone.

66. Asserting his Fourth Amendment right to be free from an unreasonable search or seizure, counsel for Mr. Janfeshan objected on the record to an invasive forensic search of his smartphone or seizure of the data on his device without an articulated suspicion.

67. The Court granted Defendants' Motion to Amend/Correct/Supplement, and did not prohibit CBP from commencing a search of Mr. Janfeshan's smartphone. *See* Order, *Janfeshan v. USCBP*, Case No. 16-CV-6915, ECF No. 15 (E.D.N.Y. Dec. 29, 2016)

(December 29 Order). The Court did, however, order that CBP and any filter team "shall not open or review any communications between plaintiff and his counsel." *Id*.

68. On January 5, 2017, counsel for Defendants notified Mr. Janfeshan's counsel that CBP was prepared to return his smartphone. Undersigned counsel provided instructions for Defendants' counsel to return the smartphone.

69. On January 9, 2017, counsel for Mr. Janfeshan received his smartphone.

70. On January 10, 2017, a day after the smartphone had been returned to Mr. Janfeshan, Defendants' counsel, without first consulting Plaintiff's counsel, filed another letter-motion, again styled as a "Motion to Amend/Correct/Supplement," asking the Court to modify its December 29 Order to permit a filter team to open privileged communications within the seized contents of Mr. Janfeshan's smartphone. ECF No. 17. Defendants' counsel stated that CBP's technological capacities would not allow for a search consistent with the December 29 Order. *Id*. ("[T]he search technology for smartphones that CBP will be using does not have the ability to isolate communications from other electronically stored information on the cellular phone without first displaying to the reviewer some or all of the metadata, substance, or content of the communications . . . .").

71. On January 13, 2017, undersigned counsel filed a response to Defendants' motion, asking that Defendants clarify what types of hardware and/or software Defendants would be using, in order to confirm that CBP was in fact technologically limited such that any search could not isolate privileged communications.

72. On January 17, 2017 the Court held a telephonic status conference to discuss the January 10 letter-motion.

73. The Court modified its December 29 order, permitting CBP to proceed with a search of Mr. Janfeshan's smartphone "in accordance with CBP's normal procedures, including the use of a filter and/or taint team to open or review any information protected by the attorney-client privilege." ECF No. 20. The Court further directed CBP to "make all reasonable efforts to avoid the review of any privileged information." *Id*.

74. The Court ordered that CBP complete its search by February 28, 2017.

**The Retention and Dissemination of the Contents of Mr. Janfeshan's Smartphone**

75. A directive issued by CBP in 2009 purports to authorize border agents to seize, detain, search, and freely dispose of the contents of an international traveler's "electronic devices." CBP Directive No. 3340-049, "Border Search of Electronic Devices Containing Information" (Aug. 20, 2009). The impermissibly broad directive claims to permit the following actions by CBP officers, among others:

   a. The review and/or analysis of all of the contents of a seized electronic device without individualized suspicion – regardless of sensitivity, password-protection, encryption, confidentiality, or privilege;

   b. The detention of a seized electronic device after the international traveler has left the border for more in-depth review and analysis, without individualized suspicion;

   c. The dissemination of the traveler's devices, electronic copies of the devices, or information obtained from those devices, to other government agencies or private parties for the purpose of obtaining assistance in the search and analysis of their contents; and

    d. The retention of a copy of information that relates to "immigration, customs, or other enforcement matters," and the sharing of that information with federal, state, local and foreign law enforcement agencies. *Id.* at § 5.4.1.2.

76. If CBP officers have "probable cause to believe that the device . . . contains evidence of or is fruit of a crime that CBP is authorized to enforce," then CBP may retain the information without restriction. However, even in the absence of probable cause or any level of suspicion, the directive allows for the retention of information relating to "immigration, customs, and other enforcement matters if such retention is consistent with the privacy and data protection standards of the system in which such information is retained." *Id.* at § 5.4.1.1-2. As such, any confidential, privileged, or otherwise private information may be retained with few restrictions.

77. The CBP directive is also overly permissive with respect to the search of privileged or confidential information. For example, the directive does not categorically prohibit the search review, retention and dissemination of business confidential information. CBP agents are instructed to treat business or commercial information as confidential information and to protect it from unauthorized disclosure, but there is no requirement of individualized suspicion to seize, search, or disseminate that information. *Id.* § 5.2.3.

78. Similarly, the CBP directive does not categorically restrict the search, review, retention and dissemination of information and/or electronic devices that contain attorney-client privileged material. *Id.* at § 5.2.1 ("Although legal materials are not necessarily exempt from a border search, they may be subject to special handling procedures."). The directive does not describe those special handling procedures.

79. The CBP directive only requires an officer to consult the Associate/Assistant Chief Counsel or the appropriate U.S. Attorney's Office before conducting a search when the officer "suspects that the content of [a] *document* may constitute evidence of a crime or otherwise pertain to a determination within the jurisdiction of CBP." *Id*. (emphasis added). The directive does not address whether CBP considers electronic devices on par with documents such that an officer is similarly required to consult the appropriate legal authority prior to conducting the search of an electronic device.

80. Moreover, the CBP directive purports to allow officers to retain attorney-client privileged information if it "pertains to immigration matters." *See id*. at § 5.4.1.2. The officers need not demonstrate any level of individualized suspicion to retain privileged material that they believe relates to immigration matters. *Id*.

81. As a result, vast swaths of information, including attorney-client privileged communications, exchanges between family members, or employment contract negotiations between an employer and employee can be retained in an individual's Alien file. *Id*. CBP and other U.S. federal agencies that oversee immigration proceedings or adjudicate applications for immigration benefits have access to information that is otherwise unavailable to them. For example, U.S. Citizenship and Immigration Services (USCIS) does not normally subpoena an applicant's phone to evaluate the bona fides of a marriage. But thanks to CBP's directive, USCIS does not have to take that extraordinary step. USCIS can take advantage of CBP's claimed authority to look behind an individual's application and/or interview to make a decision on any kind of application.

82. Defendants, acting pursuant to established CBP policies and directives, reviewed and copied the contents of Mr. Janfeshan's smartphone, retained this information, and have

15

possibly disclosed it to other U.S. government or foreign agencies that in turn, may have retained the information as well.

83. At no point has the CBP Senior Attorney, Mr. Dunn, or Mr. Schachner stated to Mr. Janfeshan's counsel or to the Court that Defendants have a warrant, probable cause, or reasonable suspicion to seize and/or search Mr. Janfeshan's smartphone.

84. This is all the more troubling since Defendants have admitted that information seized from Mr. Janfeshan's smartphone in this suspicionless and unwarranted search may be used in "a resulting prosecution or investigation." ECF No. 17.

85. Mr. Janfeshan considers the contents of his smartphone to be personal and private. Mr. Janfeshan ensures that his smartphone remains protected by locking it with a passcode.

86. Data stored on Mr. Janfeshan's smartphone, including but not limited to emails, text messages, documents, pictures, and attachments are protected by the attorney-client privilege.

87. Mr. Janfeshan has pending applications for immigration benefits with USCIS. There is a significant likelihood that information gleaned from the search of his smartphone, including information protected by attorney-client privilege, may impact USCIS's adjudication of his applications.

88. Mr. Janfeshan's phone also contains information that is highly personal, and reveals intimate details about his life, including his thoughts, his associations, and his expressive choices, which he did not intend to expose to view by others or by the government without his consent.

89. Mr. Janfeshan is likely to be subjected to similar searches in the future under CBP's unconstrained search policies because the CBP agent who sought consent to seize the

contents of his smartphone and thereafter seized that smartphone when consent was withheld chose to act based on factors that will not change, including Mr. Janfeshan's national origin and religion, and his decision to exercise his right to refuse to consent to a search by providing the passcode to his smartphone.

90. Further, it was entirely unfeasible for Mr. Janfeshan to fly to the United States without a phone – the negotiated plan to secure his return depended on his ability to reach counsel by phone while at the airport in Cairo.

## CLAIMS

## COUNT I

## VIOLATION OF FOURTH AMENDMENT

### U.S. Constitution, Amendment IV

91. Plaintiff Hemad Janfeshan incorporates by reference each and every allegation contained in the paragraphs above.

92. By searching, seizing, copying, retaining, and distributing Mr. Janfeshan's smartphone and its private contents, Defendants violated and continue to violate his rights under the Fourth Amendment to the United States Constitution.

93. By searching, seizing, copying, retaining, and distributing attorney-client privileged communications and information in Mr. Janfeshan's smartphone, Defendants violated and continue to violate his rights under the Fourth Amendment to the United States Constitution.

## COUNT II

### BREACH OF ATTORNEY-CLIENT PRIVILEGE

94. Plaintiff Hemad Janfeshan incorporates by reference each and every allegation contained in the paragraphs above.

95. By searching, seizing, copying, retaining, and distributing attorney-client privileged communications and information in Mr. Janfeshan's smartphone, Defendants impermissibly breach attorney-client privilege.

## COUNT III

### UNLAWFUL AGENCY ACTION

### Administrative Procedure Act, 5 U.S.C. § 706(2)

96. Plaintiff Mr. Hemad Janfeshan incorporates by reference each and every allegation contained in the paragraphs above.

97. By issuing the CBP directive, and searching, seizing, copying, retaining, and distributing Mr. Janfeshan's smartphone and its contents, Defendant acted in a way that was arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, and contrary to constitutional right, power, privilege, or immunity, and that should be set aside as unlawful agency action pursuant to 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, Mr. Janfeshan respectfully asks this Court to:

98. Declare that by seizing Mr. Janfeshan's smartphone and searching, reviewing, copying, retaining and disseminating its contents without reasonable suspicion, Defendants violated the Fourth Amendment to the U.S. Constitution, impermissibly breached the

attorney-client privilege, and engaged in unlawful agency action under the Administrative Procedure Act;

99. Order Defendants to return to Mr. Janfeshan all information in their custody or control obtained from Mr. Janfeshan's smartphone, including but not limited to private information and privileged communications between Mr. Janfeshan and his counsel, and to the extent the information cannot be returned, to expunge or otherwise destroy the information;

100. Order Defendants to disclose to Mr. Janfeshan (1) whether any information obtained from Mr. Janfeshan's smartphone has been disclosed or disseminated to any other agencies, organizations, individuals, state, local, or foreign governments, including but not limited to those agencies from which CBP sought technical assistance in accessing the information; (2) when and in what form any such disclosure or dissemination occurred; (3) the specific data or information which was disclosed or disseminated and to whom; and (4) the procedures used to procure any data or information that was reviewed, analyzed, copied, or disseminated from Mr. Janfeshan's phone;

101. Award Mr. Janfeshan's counsel reasonable attorneys' fees, including but not limited to fees, costs, and disbursements pursuant to 28 U.S.C. § 2412; and

102. Grant such other and further relief as the Court deems just and proper.

Date: March 22, 2017

Respectfully submitted,

\_\_\_\_/s/_____
Naz Ahmad
Tarek Z. Ismail
Ramzi Kassem
**CLEAR project**
**Main Street Legal Services, Inc.**

CUNY School of Law<br>
2 Court Square<br>
Long Island City, NY 11101<br>
T: (718) 340-4630<br>
F: (718) 340-4478<br>
E: naz.ahmad@law.cuny.edu